## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WARREN EASLEY,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:17-cv-930** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **BRENDA TRITT,** *et al.*, | : | |
| **Defendants** | : | |

### <u>MEMORANDUM</u>

This matter is before the Court pursuant to the motion for summary judgment (Doc. No. 306) filed by remaining Defendants Jason Albert ("Albert"), Karby ("Corby"), Stacy Dowd ("Dowd"), Gregiore ("Gregoire"), Kellar ("Keller"), Kistinka ("Kostinko"), Jill Marhelka ("Marhelko"), George Miller ("Miller"), Rhonda Tomcavage ("Tomcavage"), and Brenda Tritt ("Tritt").[1]  The motion is fully briefed and ripe for disposition.[2]

## I.    BACKGROUND

*Pro se* Plaintiff Warren Easley ("Plaintiff"), who is currently incarcerated at the State Correctional Institution Forest in Marienville, Pennsylvania ("SCI Forest"), is proceeding on an amended complaint filed pursuant to 42 U.S.C. § 1983 against

---

[1] Defendants' motion sets forth the proper spelling of various Defendants' names.  The Court will direct the Clerk of Court to correct the spelling of these names on the docket in the above-captioned case.

[2] On February 17, 2021, Plaintiff filed a sur-reply (Doc. No. 399) without first obtaining leave of Court to do so.  *See* M.D. Pa. L.R. 7.7.

several staff members at SCI Frackville, alleging various constitutional violations during his incarceration there. (Doc. No. 11.) By Memorandum and Order entered on August 7, 2018, the Court: (1) granted Defendant Shiptoski's motion to dismiss/motion for summary judgment and dismissed him from this action; (2) granted Defendant Boyce's motion to dismiss/motion for summary judgment and dismissed him from this action; (3) denied Defendants Albert, Boyce, Corby, Dowd, Gregoire, Kostinko, Miller, and Tomcavage's motions to dismiss/motions for summary judgment for Plaintiff's failure to exhaust administrative remedies; (4) granted Defendant Keller's motion to dismiss/motion for summary judgment for Plaintiff's failure to exhaust administrative remedies with respect to his claim that Keller called him a "rat"; (5) granted Defendant Marsh's motion to dismiss/motion for summary judgment for Plaintiff's failure to exhaust administrative remedies and dismissed Marsh from this action; (6) granted Defendant Miller's motion to dismiss/motion for summary judgment on the basis that Plaintiff's 2014 haircut exemption claim was barred by the statute of limitations; (7) granted Defendant Newberry's motion to dismiss/motion for summary judgment and dismissed her from this action; and (8) denied Plaintiff's motion for default judgment and dismissed Defendant Dr. Pandya from this action without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure. (Doc. Nos. 81, 82.) Plaintiff's

2

remaining claims allege violations of: (1) his First Amendment rights based upon a denial of his right to access the courts and retaliation; and (2) his Eighth Amendment rights based upon conditions of confinement, deliberate indifference, and the use of excessive force.

Remaining Defendants filed their answer on August 28, 2018. (Doc. No. 88.) The parties subsequently engaged in extensive discovery over the next two (2) years. Defendants filed their motion for summary judgment and supporting materials on August 21 and 24, 2020. (Doc. Nos. 306-359.) Defendants filed a corrected brief with respect to Defendant Corby on September 8, 2020. (Doc. No. 371.) Plaintiff filed his brief in opposition on January 4, 2021 (Doc. No. 394), and Defendants filed their reply brief on February 9, 2021 (Doc. No. 398).

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.* at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence which demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond his pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric*

4

*Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *White*, 826 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor. *Id.* (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant.  These rules apply with equal force to

5

all parties. *See Sanders v. Beard*, No. 09-CV-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02-CV-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

## III.   STATEMENT OF MATERIAL FACTS[3]

On March 15, 2015, Plaintiff was placed in a restraint chair for eight (8) hours, and then he was put "in an intermediate restraint belt with a belt around his waist with his hands in handcuffs attached to the front of the belt." (Doc. No. 339 ¶ 1.) This belt prevented Plaintiff "from pulling down his garments, so he soiled undergarments when he needed to use the bathroom." (*Id.* ¶ 2.) Plaintiff was denied toilet paper and the "ability to 'decontaminate.'" (*Id.* ¶ 3.) During this time, Plaintiff

---

[3] The Local Rules of Court provide that in addition to filing a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried." M.D. Pa. L.R. 56. 1. The Rule further requires the inclusion of references to the parts of the record that support the statements. *Id.* Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. *See id.* Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of material facts. (Doc. No. 339.)

Plaintiff filed a brief in opposition to the motion for summary judgment, as well as additional exhibits. (Doc. Nos. 394, 395.) In his unauthorized sur-reply, Plaintiff states that he submitted a statement of disputed factual issues and a declaration with his brief in opposition. The Court's review of Plaintiff's brief in opposition revealed that Plaintiff did submit these documents but that they were initially not docketed. However, Plaintiff's statement of disputed factual issues is not a response to Defendants' statement of facts that complies with Local Rule 56.1. Moreover, while a verified complaint may be treated as an affidavit in opposition to a motion for summary judgment, *see Ziegler v. Eby*, 77 F. App'x 117, 120 (3d Cir. 2003), Plaintiff's amended complaint states only that it is "true and correct" and is not sworn under the penalty of perjury. The Court, therefore, will not consider Plaintiff's amended complaint as evidence to rebut Defendants' motion for summary judgment. *See Liddick v. Tritt*, No. 1:14-cv-1813, 2017 WL 4211051, at *2 (M.D. Pa. Aug. 31, 2017). Accordingly, the Court deems the facts set forth by Defendants to be undisputed. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; *United States v. Alberto*, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020) (concluding that "[f]ailure to file this [responsive statement of material facts] results in admission of the moving party's statement of facts").

was "in a cell with security night lighting and no mattress on a steel bed." (*Id.* ¶ 4.) Feces were present in the cell. (*Id.*)

On April 8, 2015, Plaintiff was placed in the intermediate restraint belt so that he could not harm himself or others. (*Id.* ¶ 5.) While in the cell, Defendant Albert came "with an extraction team and sprayed him with oleoresin capsicum ('OC') spray." (*Id.* ¶ 6.) Plaintiff was kept in the cell for a period of time and then Defendant Albert moved him to a restraint chair "with tight straps." (*Id.*) Plaintiff was then transported to another part of the prison. (*Id.* ¶ 7.) He was "jostled during the ride, and suffered some swelling in his wrists and ankles under the straps." (*Id.*) Defendant Corby "struck him in the face out of camera view." (*Id.*) "Plaintiff remained in the chair for sixteen hours and then was placed in the intermediate restraint belt." (*Id.*)

On April 9, 2015, Defendant Albert and an extraction team came to Plaintiff's cell while Plaintiff was in the intermediate restraint belt. (*Id.* ¶ 8.) During the extraction, "Plaintiff's head repeatedly struck the ground, causing his face to bleed and requiring stitches." (*Id.*) Plaintiff was placed in the restraint chair for eight (8) hours. (*Id.*)

8

Between April 23, 2015 and July 2016, "Plaintiff wrote almost fifty grievances about untimely responses and manipulation of grievances." (*Id.* ¶ 9.) Defendant Tritt "addressed the second level of appealed grievances." (*Id.* ¶ 10.)

On May 12, 2015, Plaintiff was placed in the restraint chair for sixteen (16) hours and was then placed in the intermediate restraint belt for twenty-four (24) hours. (*Id.* ¶ 11.) He "went into a 'grind up' cell with his boxer briefs and a restraint belt but without a mattress, clothes, linen, and the water was turned off." (*Id.* ¶ 12.) The cell was illuminated by lights that Plaintiff could not turn off. (*Id.* ¶ 13.) Plaintiff remained in the cell until May 17, 2015. (*Id.* ¶ 14.) During that time, Plaintiff "was cold and had trouble sleeping." (*Id.* ¶ 15.)

On May 17, 2015, Defendant Dowd extended Plaintiff's restrictions. (*Id.* ¶ 16.) Defendants Dowd and Keller denied Plaintiff's requests for a mattress, clothes, toilet paper, and water. (*Id.* ¶ 17.) "Plaintiff could not sleep due to the lights and restrictions until May 20, 2015." (*Id.* ¶ 18.)

On May 20, 2015, Plaintiff was placed in the restraint chair to have his hair cut. (*Id.* ¶ 19.) He did not consent to the haircut. (*Id.*) Plaintiff was "tasered" five (5) times during this incident. (*Id.* ¶ 20.) Plaintiff subsequently stayed in the restraint chair for sixteen (16) hours "until he was placed in the intermediate restraint belt, where he remained for 30 hours, and went back into the grind up cell without

9

toilet paper, a mattress, linens, and with the lights on, until June 2, 2015." (*Id.* ¶ 21.) Plaintiff "suffered PTSD from the haircut and began to lose weight." (*Id.* ¶ 22.) On May 30, 2015, "Plaintiff had patches and bald spots on his head, was due for his weekly haircut, and was denied a haircut by [Defendants] Albert and Keller." (*Id.* ¶ 23.)

On June 15, 2015, Plaintiff requested to go to the "MHU." (*Id.* ¶ 24.) He "attempted suicide, resulting in five stitches to his left wrist." (*Id.* ¶ 25.) The next day, while on suicide watch, "Plaintiff again attempted suicide resulting in five stitches to his right wrist." (*Id.* ¶ 26.) He was denied mental health treatment. (*Id.* ¶ 27.) On June 19, 2015, after attempting suicide, Plaintiff "was taken to an outside hospital and received fourteen stitches in his left wrist." (*Id*. ¶ 28.) After returning to the facility, he was placed in the restraint chair. (*Id.* ¶ 29.)

On June 21, 2015, Plaintiff was placed in the restraint chair for eight (8) hours, "was removed for a period of time, and then was put back into the restraint chair for another fourteen hours." (*Id.* ¶ 30.) After twenty-two (22) hours in the chair, Plaintiff was placed in a "dry cell," and his "right arm was handcuffed to the leg of the bed and his left leg was handcuffed to the floor." (*Id.* ¶ 31.) This prevented Plaintiff from using the bathroom. (*Id.*) Plaintiff "was refused break periods to exercise, use the bathroom, and 'proper' meals." (*Id.* ¶ 32.) He "defecated and

10

urinated on the floor." (*Id.*)  "There was constant illumination in the cell, and Plaintiff was prevented from sleeping and his eyes burned from the stool and urine on the floor." (*Id.* ¶ 33.)  "Plaintiff lived in these conditions from June 22 until June 24, 2015 and suffered cramps." (*Id.* ¶ 34.)

On July 15, 2015, Plaintiff attempted to commit suicide by cutting his wrists and stuffing them with feces.  (*Id.* ¶ 35.)  On July 27, 2015, "Plaintiff was placed in the intermediate restraint belt under the direction of [Defendant] Gregoire to prevent him from self-harm." (*Id.* ¶ 36.)  Lieutenant Moser told Plaintiff that Defendant Miller "said he was sick of playing games with him and to put him in a dry cell until he acted like an adult." (*Id.* ¶ 37.)

On July 28, 2015, Plaintiff "was placed on a dry cell with his wrist and leg shackled to the floor while laying on the bed, which caused him to be uncomfortable and suffer pain, and his complaints were ignored." (*Id.* ¶ 38.)  After ten (10) or twelve (12) hours in this position, Plaintiff's arm "swelled to three times its normal size, and he began hallucinating." (*Id.* ¶ 39.)  Plaintiff was placed in the restraint chair for sixteen (16) hours. (*Id.* ¶ 40.)  He was then moved back to the dry cell and restrained to the bed. (*Id.* ¶ 41.)  "Since he was in restraints, he defecated and urinated on the floor." (*Id.* ¶ 42.)  Plaintiff "was unable to sleep and his eyes turned yellow because of the stool and urine on the floor." (*Id.* ¶ 43.)  Plaintiff remained in

11

the cell until August 1, 2015. (*Id.* ¶ 44.) On August 1, 2015, Plaintiff was removed from the cell and placed in the intermediate restraint belt, where he remained for forty-eight (48) hours, until August 3, 2015. (*Id.* ¶¶ 45-46.)

On August 3, 2015, Defendant Tomcavage denied Plaintiff's requests for clothes, linens, and a mattress. (*Id.* ¶ 47.) Defendant Tomcavage requested, and Defendant Miller approved, Plaintiff's placement in the restraint chair for eight (8) hours for refusing to obey an order and disrespecting staff. (*Id.* ¶ 48.) On August 4, 2015, the restraint chair was removed. (*Id.* ¶ 49.) Defendant Tomcavage denied Plaintiff's requests for toilet paper, a mattress, clothes, and linens, and "told him he would have to earn them through good behavior." (*Id.* ¶ 50.) Plaintiff replied that he "would write to third-party support groups about the conditions and file a grievance." (*Id.* ¶ 51.) Defendant Tomcavage then "responded she was contacting [Defendant] Miller to put him back in the restraint chair." (*Id.* ¶ 52.) Plaintiff was then put in the restraint chair for eight (8) hours. (*Id.* ¶ 53.)

On August 5, 2015, Defendant Albert "visited Plaintiff's cell and said 'I told you I would get you,' and sprayed his face with oleoresin capsicum ('OC') spray until the canister was empty." (*Id.* ¶ 54.) Plaintiff was in shock and tripped over the toilet and fell, hitting his face and shoulder." (*Id.* ¶ 55.) He had trouble seeing and breathing, and was coughing and vomiting. (*Id.* ¶ 56.) Defendant Albert "closed the

12

opening in Plaintiff's cell door, taunted him, and then left laughing." (*Id.* ¶ 57.) Plaintiff was then put into the restraint chair, and Defendant Albert tightened the straps." (*Id.* ¶ 58.) Plaintiff remained in the chair for sixteen (16) hours, causing his ankles, wrists, and shoulders to swell. (*Id.* ¶ 59.) Plaintiff was then placed in a "grind up cell" with constant illumination, and Defendant Tomcavage denied his requests for toilet paper, clothing, and a mattress. (*Id.* ¶ 60.) Because he did not have any toilet paper, Plaintiff "used orange peels and Styrofoam and plastic wrappers for hygienic purposes." (*Id.* ¶ 61.) Plaintiff remained in the cell until August 13, 2015. (*Id.* ¶ 62.)

On August 14, 2015, Plaintiff was placed in the intermediate restraint belt and then twenty (20) minutes later, he was placed in the restraint chair. (*Id.* ¶ 63.) "Plaintiff was placed in a 'two point' dry cell with his left arm and right leg handcuffed to the floor with him on a bed." (*Id.* ¶ 64.) Plaintiff urinated and defecated on the floor. (*Id.* ¶ 65.) The cell had constant illumination, and Plaintiff "was unable to sleep until September 8, 2015." (*Id.* ¶ 66.)

On August 15, 2015, "Plaintiff was on a medical diet of six small meals a day due to 'small gut syndrome' after suffering complications from a gunshot wound." (*Id.* ¶ 67.) Despite this, "Plaintiff was given food loaf, which he could not digest." (*Id.* ¶ 68.) "Plaintiff complained and was ignored." (*Id.* ¶ 69.) He learned "he was

13

on a 'seven day step-down' program, where he had to earn his desired food, clothes, recreation, a mattress, toilet paper, grievances, legal work, hygienic products, and showers." (*Id.* ¶ 70.) The program was put in place by Defendants Tomcavage, Keller, and Miller. (*Id.* ¶ 71.) "Plaintiff did not eat the food provided until August 18, 2015 and missed a total of twelve meals." (*Id.* ¶ 72.)

On August 17, 2015, Plaintiff "was put in the restraint chair and, at the direction of [Defendant Tritt], had a smock blanket placed around his body, which is not the typical practice for a smock blanket." (*Id.* ¶ 73.) "The blanket was choking him, and he began to sweat and hyperventilate." (*Id.* ¶ 74.) Plaintiff remained in the smock blanket for eight (8) hours. (*Id.* ¶ 75.)

On August 21, 2015, "Plaintiff was put on a seven day step down program to earn grievances, desired food, a mattress, clothing, and recreation." (*Id.* ¶ 76.) During this time, Plaintiff was served food loaf. (*Id.* ¶ 77.) He could not digest the food loaf and "missed a total of fifteen meals through August 25, 2015." (*Id.*)

On August 27, 2015, Plaintiff was sprayed with OC spray four (4) times. (*Id.* ¶ 78.) On August 28, 2015, Defendant Tomcavage "refused Plaintiff's request to 'decontaminate' and responded that he will suffer until he breaks." (*Id.* ¶ 79.) "Plaintiff's skin swelled from the OC spray, and his groin and buttocks burned until

September 1, 2015." (*Id.* ¶ 80.) "Plaintiff's mental state deteriorated from the lack of recreation time." (*Id.* ¶ 81.)

On September 6, 2015, Plaintiff developed a cyst under his armpit, which he believed was from the prison conditions. (*Id.* ¶ 82.) On September 8, 2015, "after fifty-two days of restrictions, Plaintiff completed the step-down program and was supposed to be taken back to the Behavior Modification Unit ('BMU')." (*Id.* ¶ 83.) Instead, "Plaintiff was transferred to SCI Huntingdon out of retaliation." (*Id.* ¶ 84.)

On September 10, 2015, "Plaintiff attempted to hang himself and was left in the cell bleeding all night." (*Id.* ¶ 85.) That same day, "Plaintiff's property was thrown away, including over three hundred pages of legal work including grievances and a lawsuit against SCI Greene County." (*Id.* ¶ 86.) "Plaintiff was made whole for the books and property but was never given his legal work back." (*Id.* ¶ 87.)

On August 16, 2015, Plaintiff returned to SCI Frackville, where he was "put in a grind up cell with constant illumination on a seven day step-down program." (*Id.* ¶ 88.) On October 21, 2015, Plaintiff learned that a family member had died and requested to speak to a member of the psychology department, "but he was denied and was put in the restraint chair upon threats of self-harm." (*Id.* ¶ 89.) "Plaintiff coughed and complained [of] OC spray on the chair but still remained in

the chair for eight hours." (*Id.* ¶ 90.)  Plaintiff was back on the step-down program on October 22, 2015. (*Id.* ¶ 91.)

On November 13, 2015, Plaintiff "was removed from the grind up cell and was put in a cell until November 16, 2015 that had a metal box covering the light switch, and the cell had security night lighting that was constantly on." (*Id.* ¶ 92.) On November 20, 2015, Defendant Albert "had Plaintiff extracted from his cell, stripped him in a strip cage, left him naked in front of a female nurse, and walked him while still naked in front of inmates, to which one inmate made fun of him." (*Id.* ¶ 93.)

On December 18, 2015, "Plaintiff was escorted by [Defendant] Gregoire, who then put him in a cell naked, upon the direction of [Defendant] Miller." (*Id.* ¶ 94.) Later, "Plaintiff was taken out of the cell, still naked, and had to stand [in] front of his cell door where other inmates and a female nurse could see him." (*Id.* ¶ 95.)

On December 22, 2015, Defendant Kostinko was escorting Plaintiff to his cell when "he made derogatory comments and pushed Plaintiff's face into the wall, then pushed him onto the ground, and then put his elbow around Plaintiff's neck, all while Plaintiff was handcuffed." (*Id.* ¶ 96.)  Plaintiff suffered neck injuries from the event. (*Id.* ¶ 97.)  Defendant Kostinko told Plaintiff "his actions were for [Defendant] Tomcavage and the rest of the staff and what Plaintiff had put them all through."

16

(*Id.* ¶ 98.)  Defendant Kostinko's "initial report on the event, along with Alshefski, mentioned that Plaintiff had elbowed him, provoking the use of force."  (*Id.* ¶ 99.)

On January 31, 2016, Plaintiff injured his right middle finger in the yard.  (*Id.* ¶ 100.)  He was sent to the hospital and diagnosed with tendon damage.  (*Id.*) Plaintiff "was denied follow-up treatment, leaving him with a disfigured finger." (*Id.*)

On February 12, 2016, Plaintiff was assaulted with urine by another inmate. (*Id.* ¶ 101.)  Defendant "Marhelko went to the cell door of the inmate who threw urine on Plaintiff and told him that he was not in trouble because he supported the home team."  (*Id.* ¶ 102.)  The inmate later told Plaintiff "he was paid honeybuns to attack him."  (*Id.* ¶ 103.)

On February 29, 2016, Defendant Marhelko "came to the BMU and announced that Plaintiff is a rat, which caused Plaintiff to be threatened."  (*Id.* ¶ 104.)  On March 16, 2016, Plaintiff asked her why she called him a rat, and "she told him to 'write it up.'"  (*Id.* ¶ 105.)  On April 15, 2016, Defendant Marhelko "told Plaintiff she hoped they strapped him down and cut his hair again."  (*Id.* ¶ 106.)

On May 11, 2016, Plaintiff was threatened by an inmate in front of Defendants Tomcavage and Miller.  (*Id.* ¶ 107.)  On May 16, 2016, "Plaintiff was put in a yard pen, a 'cage,' with another inmate and was assaulted by the inmate."  (*Id.* ¶ 108.)

17

On August 3, 2016, Defendant Albert "encouraged Plaintiff to swallow nail clippers and stated 'chug.'" (*Id.* ¶ 109.)  Defendant Miller then told Plaintiff "to sift through his stool for the metal or be placed in a dry cell, and Plaintiff had to sift through his stool without gloves thirty-eight times between August 3, 2016 and August 15, 2016, while he was in a grind up cell with constant illumination." (*Id.* ¶ 110.)  On August 9, 2016, Defendant Tomcavage told Plaintiff "he could get his property, a mattress, and his legal work when he produced the nail clippers." (*Id.* ¶ 111.)

Between March 3, 2015, and October 3, 2016, "Plaintiff wanted to commit suicide over thirty times, resulting in over sixty stitches and three trips to the hospital." (*Id.* ¶ 112.)  Defendant Marsh "receives a weekly notification of the status of all inmates in the BMU and is notified anytime an inmate is put in the restraint chair or in a dry cell." (*Id.* ¶ 113.)  "Plaintiff has written and spoken to [Defendant] Marsh about various events, and [Defendant] Marsh acknowledged his complaints but did nothing to resolve them." (*Id.* ¶ 114.)

## IV.    DISCUSSION

### A.    Personal Involvement

Defendants first maintain that they are entitled to judgment in their favor because of a lack of personal involvement in most of the alleged wrongs.  (Doc. No.

18

338 at 12.)  They assert that "[t]o the extent that Plaintiff takes issues with verbal harassment by Defendants, such behavior, while unpleasant, does not rise to the level of an Eighth Amendment violation." (*Id.* at 17.)  They also maintain that "to the extent that Plaintiff takes issue with the actions of defendants acting as grievance officers, they are entitled to judgment in their favor because there is no constitutionally protected right to a specific grievance procedure for inmates." (*Id.* at 17-18.)  In their reply brief, Defendants clarify that Defendant Tritt is entitled to judgment due to a lack of personal involvement in most of the alleged wrongs.  (Doc. No. 398 at 5-6.)

Under § 1983, individual liability may be imposed only if the state actor played an "affirmative part" in the alleged misconduct. *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)).  Liability "cannot be predicated solely on the operation of *respondeat superior*." *Id.*  In other words, defendants "must have personal involvement in the alleged wrongs . . . shown through allegations of personal direction or of actual knowledge and acquiescence." *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 120-08.  Moreover, the filing of a grievance, participation in "after-the-fact" review of a grievance, or dissatisfaction with the response to an inmate's grievance, does not establish the involvement of officials and

administrators in any underlying constitutional deprivation. *See Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) ("The District Court properly dismissed these defendants and any additional defendants who were sued based on their failure to take corrective action when grievances or investigations were referred to them."); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (holding that allegations that prison officials responded inappropriately to inmate's later-filed grievances do not establish the involvement of those officials and administrators in the underlying constitutional deprivation); *Ramos v. Pa. Dep't of Corr.*, No. 06-1444, 2006 WL 2129148, at *3 (M.D. Pa. July 27, 2006) ("[C]ontentions that certain correctional officials violated an inmate's constitutional rights by failing to follow proper procedure or take corrective action following his submission of an institutional grievance are generally without merit."); *Wilson v. Horn*, 971 F. Supp. 943, 947 (E.D. Pa. 1997) (noting that a complaint alleging that prison officials failed to respond to the inmate-plaintiff's grievance does not state a constitutional claim), *aff'd*, 142 F.3d 430 (3d Cir. 1998); *see also Rode*, 845 F.2d at 1207 (concluding that where a defendant, after being informed of the violation through the filing of grievances, reports, or appeals, failed to take action to remedy the alleged wrong is not enough to show that the defendant had the necessary personal involvement); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (concluding that a mere "linkage

in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of a civil rights action).

With respect to supervisory liability, there are two theories: "one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010 (quotation and alteration marks omitted).  As to the second theory, a plaintiff must show that each defendant personally participated in the alleged constitutional violation or approved of it.  *See C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 173 (3d Cir. 2005); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). With respect to the first, "the plaintiff must establish that: (1) existing policy or practice creates an unreasonable risk of constitutional injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice." *Merring v. City of Carbondale*, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).

The record reflects that Defendant Tritt reviewed Plaintiff's first-level appeals of his grievances. While the review of grievances will not establish personal involvement in an underlying violation, several courts have concluded that a supervisory official may be held liable stemming from the review of a grievance alleging an ongoing violation because the official "is personally involved in that violation because he is confronted with a situation he can remedy directly." *See Mayo v. Oppman*, No. CV 17-311, 2018 WL 1833348, at *4 (W.D. Pa. Jan. 23, 2018), *Report and Recommendation adopted*, 2018 WL 943528 (W.D. Pa. Feb. 20, 2018); *Gibbs v. Univ. Corr. Healthcare*, No. CV 14-7138 (MAS) (LHG), 2016 WL 6595916, at *2 (D.N.J. Nov. 7, 2016); *Whitehead v. Rozum*, No. 11-102, 2012 WL 4378193, at *2 (W.D. Pa. Aug. 7, 2012). In the instant case, the evidence before the Court indicates that Plaintiff did present several grievances intended to correct ongoing alleged violations. *See Talley v. Wetzel*, No. 2:18-cv-230, 2018 WL 6198364, at *2-3 (W.D. Pa. Nov. 28, 2018) (concluding that the inmate-plaintiff had stated plausible supervisory liability claims because he submitted grievances for each day he was subjected to the challenged conditions). Moreover, Plaintiff has presented evidence suggesting that Defendant Tritt was personally involved in the decisions to, *inter alia*, place him in the restraint chair and intermediate restraint belt and the use of force to cut Plaintiff's hair. Plaintiff has also presented evidence that

22

Defendant Tritt directed that a smock blanket be cuffed around his neck.  For these reasons, the Court will deny summary judgment on the basis that Defendant Tritt lacked personal involvement in the alleged wrongs.

### B.     Eighth Amendment Claims

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.  There are several types of Eighth Amendment claims, including claims alleging: denial of, or inadequate access to, medical care; exposure to adverse conditions of confinement; and the use of excessive force by prison guards.   An Eighth Amendment claim includes both objective and subjective components.  *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. *See id.*  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind."  *See id.*

### 1.     Conditions of Confinement

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm."  *See Bistrian v. Levi*, 696 F.3d

23

352, 367 (3d Cir. 2015).   "[T]he Constitution does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).   Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination . . . deprive inmates of the minimal civilized measures of life's necessities." *See id.* at 347.   Such necessities include "adequate food, clothing, shelter, and medical care." *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992).   However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson*, 501 U.S. at 304 and *Rhodes*, 452 U.S. at 347).

### a.   Security Lighting

Throughout his amended complaint, Plaintiff avers that he was subject to constant illumination while in the BMU.  He maintains that the constant illumination caused him to be unable to sleep and to experience headaches.  (Doc. No. 11 ¶ 51.) Defendants assert that they are entitled to summary judgment because this Court has "addressed the security lighting in cells at SCI Frackville and found there was a

24

legitimate security reason for the minimal security lighting during the night—for staff to see inside the cell to ensure that the inmate is present and safe at all times." (Doc. No. 338 at 24.)

The United States Court of Appeals for the Third Circuit has noted that "[i]n some instances where continuous lighting causes inmates to suffer physical and psychological harm, courts have held that living in constant illumination is without penological justification." *Huertas v. Sec'y Pa. Dep't of Corr.*, 533 F. App'x 64, 68 n.7 (3d Cir. 2013) (collecting cases); *see also Stewart v. Beard*, 417 F. App'x 117, 119-20 (3d Cir. 2011) (collecting cases). Recently, the Third Circuit noted that "bright, constant illumination that causes 'grave sleeping problems and other mental and psychological problems' can establish an Eighth Amendment deprivation." *Mammana*, 934 F.3d at 374 (quoting *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996)). "[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013). This Court has previously concluded that there is a legitimate penological justification for the 24-hour security lighting in the Restricted Housing Unit ("RHU") at SCI Frackville because it is "needed for staff to observe the inmates at night and . . . to see inside the cells at all times to confirm that the inmate[s] [are] present and safe." *Spencer v. Wetzel*, No. 3:12-cv-616, 2014 WL 1056424, at *5

25

(M.D. Pa. Mar. 17, 2014), *aff'd sub nom. Spencer v. Sec'y Dep't of Corr.*, 618 F. App'x 85 (3d Cir. 2015).

In support of their motion, Defendants have provided a declaration from Jeff Newhard, the Fire and Safety Manager at SCI Frackville.  (Defs. Ex. CZ.)  Mr. Newhard is familiar with the lighting in the BMU.  (*Id.* ¶ 4.)  Each cell "contains a light fixture, which contains a security or night light."  (*Id.*)  The "cell security light is on 24 hours per day in order to aid officers in seeing inside the cell during their tours of the housing unit."  (*Id.*)  The lights are to ensure inmate safety and give off a minimal amount of light.  (*Id.* ¶¶ 5-6.)  "The larger lights in the BMU hallway are on during the day and are turned off at night."  (*Id.* ¶ 7.)  Inmates in the BMU "cannot control the security lights in their cells and/or lights in hallway."  (*Id.* ¶ 8.)  Moreover, inmates in the BMU "are not to cover or modify the lights in their cells."  (*Id.*)  "The illumination levels of the security lights in the BMU have been unchanged since at least 2013."  (*Id.* ¶ 9.)  Mr. Newhard does not believe that the lights are "harsh or excessive" or that they pose a health risk.  (*Id.* ¶ 10.)

In the instant case, even though Plaintiff avers that he could not sleep because of the lighting, he has failed to demonstrate that the lighting "caused any physical or mental problems to the extent that they required medical attention." *Stewart*, 417 F. App'x at 120.  Moreover, nothing in the record suggests that Defendants "knew the

security light might pose a substantial risk of serious harm to" Plaintiff.  *Spencer*, 618 F. App'x at 89.  "Given the general consensus among courts that some minimal level of constant lighting does not violate the Eighth Amendment, it would not be fair to say that the lighting at SCI-Frackville posed any obvious risk to inmate health and safety generally."  *Id.*  Accordingly, the Court will grant summary judgment to Defendants with respect to Plaintiff's Eighth Amendment claim concerning the security lighting.

### b.      Seen Nude by Others

Plaintiff claims that on November 20, 2015, Defendant Albert extracted him from his cell and forced him to strip, leaving him naked in front of a female nurse. (Doc. No. 11 ¶ 157.)  Plaintiff avers that Defendant Albert took him out of the strip cage and "paraded" him naked to his cell in front of other inmates.  (*Id.*)  Plaintiff alleges that on December 18, 2015, Defendant Gregoire paraded him around the unit naked and that he was later pulled out of his cell, while still naked, and held in front of his cell in view of other inmates and a female nurse.  (*Id.* ¶¶ 159-60.)  Defendants assert that Plaintiff's complaint that other inmates saw him naked "does not rise to the level of an Eighth Amendment violation, even if he experienced some embarrassment."  (Doc. No. 338 at 24.)

This Court has noted that when female staff members' observations of naked prisoners are done for a valid penological reason, no Eighth Amendment violation exists. *See Solan v. Ranck*, No. 1:06-cv-49, 2007 WL 4111424, at *8 (M.D. Pa. Nov. 16, 2007) (citations omitted). Here, the evidence before the Court indicates that on both occasions about which Plaintiff claims, a female nurse was present because of the planned uses of force. On November 20, 2015, a female nurse was present to medically assess Plaintiff after he was placed in the intermediate restraint belt. (Defs. Ex. CL.) On December 18, 2015, a female nurse was present to remove OC spray from Plaintiff. (Defs. Ex. CP.) Plaintiff has provided no evidence that creates a genuine issue of material fact as to whether the female nurses observed Plaintiff naked for a valid penological reason. Accordingly, Defendants' motion for summary judgment will be granted to the extent Plaintiff asserts his Eighth Amendment rights were violated when female nurses observed him naked.

Plaintiff also avers that other inmates were allowed to see him naked when he was "paraded" through the unit on both occasions. "Although limited in the prison context, a person has a basic right of privacy in his naked body, not just in not having it viewed by the opposite sex, although the interest is stronger in the latter circumstances." *Solan*, 2007 WL 4111424, at *9. "Shielding one's unclothed figure from the view of strangers . . . is impelled by elementary self-respect and personal

28

dignity." *Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988). This Court has recognized that the Eighth Amendment protects against deliberate nude displays of inmates by prison staff. *Solan*, 2007 WL 4111424, at *9. "The objective component is satisfied by the unnecessary nakedness, the subjective component by the intent to humiliate in doing so." *Id.*

In the instant case, there is a genuine issue of material fact regarding whether Plaintiff was "paraded" naked through the unit on two (2) occasions. While some of the investigatory documents suggest that Plaintiff was completely naked on both occasions, other documents infer that a security blanket or smock was placed around his waist and held in place by the staff members escorting him. Moreover, the video evidence does suggest, at certain points, that Plaintiff was completely naked when he was escorted through the unit on both dates. Furthermore, the assertion that Plaintiff was naked when he was taken back to his cell on both occasions "supports the inference that [Defendants Albert and Gregoire] intended to humiliate him, an action without any penological justification." *Solan*, 2007 WL 4111424, at *8. Given these issues of fact, the Court cannot grant summary judgment to Defendants with respect to this claim.

### c.    Provision of Food Loaf

Plaintiff next alleges that his Eighth Amendment rights were violated when he was provided food loaf for meals from August 15, 2015 through August 18, 2015. (Doc. No. 11 ¶¶ 123, 132.)  Plaintiff avers that he could not digest the food loaf and that at the time, he was on a medical diet of six (6) small meals because of small gut syndrome due to a gunshot wound and complications following surgeries.  (*Id.* ¶ 124.)  Plaintiff maintains that Defendant Tomcavage told him that he would have to earn his medical diet and that he missed twelve (12) meals because of "unwarranted food restriction."  (*Id.* ¶¶ 131-32.)  He avers that the step-down program was approved by Defendants Miller and Tritt.  (*Id.* ¶ 133.)  Plaintiff also maintains that he missed fifteen (15) meals from August 21, 2015 through August 25, 2015 because he was again placed on food loaf.  (*Id.* ¶¶ 139-40.)

"A Food Loaf is a 29-30 ounce loaf (raw weight) made of various food ingredients as specified by the [DOC's] standardized recipe . . . that when blended together and baked, contains all the necessary caloric and nutritional requirements." *Brown v. Sobina*, No. 08-128E, 2009 WL 5173717, at *6 (W.D. Pa. Dec. 29, 2009). While inmates have a right to a nutritionally adequate diet, *see Laufgas v. Speziale*, 263 F. App'x 192, 198 (3d Cir. 2008), they have no constitutional right to be served a particular type of meal.  *See Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990).

Thus, "replacement of an inmate's diet with a food loaf that [is] nutritionally similar or identical to the inmate's regular diet [does] not violate the Eighth Amendment." *Gannaway v. Berks Cty. Prison*, No. 09-4501, 2011 WL 1196905, at *4 (E.D. Pa. Mar. 31, 2011).

Defendants assert that "[t]o the extent that Plaintiff claims he suffered any temporary, ill effects from the food, temporary discomfort does not establish an Eighth Amendment violation." (Doc. No. 338 at 25.)  The evidence before the Court establishes that Plaintiff had a therapeutic diet in place in August of 2015.  According to the therapeutic diet, Plaintiff was to receive no caffeine and no sweets. (Doc. No. 395 at 45.)  He also was to receive six (6) small meals per day. (*Id.*)  Plaintiff has also provided a declaration stating that Defendants Tomcavage, Miller, and Tritt were aware of his therapeutic diet and instead provided him the food loaf, forcing him to "earn" his diet tray. (Doc. No. 394-2 ¶¶ 4-6.)  Plaintiff's deposition testimony corroborates his declaration. (Defs. Ex. W.)  The record, however, is devoid of evidence that would permit the Court to conclude that the food loaf provided to Plaintiff was nutritionally similar or identical to his therapeutic diet. *See Gannaway*, 2011 WL 1196905, at *4.  The Court, therefore, concludes that genuine issues of material fact exist regarding whether the provision of food loaf by Defendants Tomcavage, Miller, and Tritt violated Plaintiff's Eighth Amendment rights.  The

Court, therefore, will deny the motion for summary judgment with respect to this claim.

### d. Cell Conditions

Throughout his amended complaint, Plaintiff complains of the conditions in the "grind up" cell. (Doc. No. 11.) He asserts that he was denied a mattress, linens, clothes, and toilet paper on several occasions, and that the water in the cell was turned off. (*Id.*) He also asserts that while in the dry cell, he was shackled in a way that prevented him from using the toilet, causing him to have to relieve himself on the floor. (*Id.*) Plaintiff avers that the cell was freezing and that, on occasion, he had to use Styrofoam and plastic wrappers to clean himself. (*Id.*) Defendants argue that they are entitled to summary judgment because there is no evidence that Plaintiff suffered harm as a result of these conditions and because courts have found that more severe conditions did not violate the Eighth Amendment. (Doc. No. 338 at 26-27.)

The Third Circuit has recognized that "even though administrative confinement in a dry cell is unpleasant and often unsanitary, so long as the conditions of that confinement are not foul or inhuman, and are supported by some penological justification, they will not violate the Eighth Amendment." *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020). Upon consideration of the record, the Court concludes that the conditions of which Plaintiff complains, while unpleasant, do not rise to the

level of an Eighth Amendment violation. Plaintiff's declaration suggests that he was subjected to these conditions for short durations of time on each occasion. (Doc. No. 394-2.) The Court recognizes that the "duration and conditions of . . . confinement cannot be ignored in deciding whether such confinement meets constitutional standards;" however, the "touchstone is the health of the inmate." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992), *superseded by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000).

In the instant case, however, there is no evidence that Defendants knew of and disregarded a substantial risk of harm caused by the conditions Plaintiff alleges. The Third Circuit has noted that the temporary denial of toilet paper does not violate the Eighth Amendment. *See Brooks v. Bledsoe*, 682 F. App'x 164, 170 (3d Cir. 2017); *Freeman v. Miller*, 615 F. App'x 72, 77 (3d Cir. 2015). Likewise, Plaintiff's allegations that the cell was freezing are "vague and conclusory and [do] not elaborate with specificity regarding the severity of the cold or the harm he faced." *Coit v. Garman*, 812 F. App'x 83, 87-88 (3d Cir. 2020) (citing *Mammana*, 934 F.3d at 373). Likewise, the denial of clothing and a mattress for short periods of time does not rise to the level of an Eighth Amendment violation. *See Freeman*, 615 F. App'x at 77 (denial of clothing and mattress for seven (7) days); *Adderly v. Ferrier*, 419 F. App'x 135, 139-40 (3d Cir. 2011) (denial of clothing and mattress for seven

33

(7) days).  Likewise, while Plaintiff testified that he was improperly shackled and that his arm swelled up, he also testified that he received medical attention for this condition.  (Defs. Ex. W.)  Overall, while the Court recognizes that the conditions of which Plaintiff complains were unpleasant, "the Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free of discomfort."  *Rhodes*, 452 U.S. at 349.  The Court, therefore, will grant Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claim concerning the conditions in his cell.

### 2.    Denial of Medical Care

In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents

a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 842)). Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.*

The record before the Court establishes that Plaintiff was being treated on an ongoing basis by both medical and mental health staff. For example, during his deposition, Plaintiff testified that a doctor saw him twice for a swollen arm. (Defs. Ex. W.) Plaintiff's Inmate Cumulative Adjustment Records ("ICAR") indicate that he consistently received mental health treatment. (Defs. Ex. Y.) Moreover, the

medical staff prescribed him a therapeutic diet due to short gut syndrome.  (Defs. Ex. AA.)  The records further provide that Plaintiff received medical care after use of force incidents.  (*See, e.g.* Defs. Exs. AH, AJ, AL, AS, BO.)   Plaintiff has presented no evidence suggesting that Defendants had "reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating)" him.  *Spruill*, 372 F.3d at 236.  Absent such evidence, Defendants cannot be charged "with the Eighth Amendment scienter requirement of deliberate indifference."  *Id.*  The Court, therefore, will grant summary judgment to Defendants with respect to Plaintiff's denial of medical care claims.

### 3.      Failure to Protect

In his amended complaint, Plaintiff alleges that on February 12, 2016, he was assaulted with urine by another inmate "upon direction of Defendant[s] Marhelko and Tomcavage."  (Doc. No. 11 ¶ 168.)  Plaintiff avers further that on February 29, 2016, Defendant Marhelko came to the BMU "promulgating that Plaintiff was a rat. Plaintiff was then threatened and told he would be assaulted first chance he gets." (*Id.* ¶ 173.)  He maintains that Defendant Marhelko again labeled him as a rat in front of other BMU inmates on March 16, 2016.  (*Id.* ¶ 174.)  On May 11, 2016, Plaintiff was threatened by a neighboring inmate in front of Defendants Tomcavage

and Albert.  (*Id.* ¶ 177.)  On May 16, 2016, Plaintiff was placed in a cage with the neighbor and was assaulted by that inmate.  (*Id.* ¶ 178.)

The Eighth Amendment requires prison officials to "take reasonable measures to protect prisoners from violence at the hands of other prisoners."  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  While prison officials have the duty to protect prisoners from attacks by other prisoners, not every injury suffered by a prisoner at the hands of another equates to constitutional liability for the officials responsible for that inmate's safety.  *Id.* at 833-34.  Rather, an inmate raising a failure to protect claim under the Eighth Amendment must establish that a prison official both knew of and chose to disregard an "excessive risk to inmate health or safety."  *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  This knowledge requirement is subjective, "meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  *Id.*; *see also Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).  Actual knowledge may be proven circumstantially in situations where the general danger was obvious.  *Farmer*, 511 U.S. at 842.  For example, if the prisoner

> presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information

37

concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Id.* at 842-43.   However, "a defendant can rebut a *prima facie* demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Beers-Capitol*, 245 F.3d at 133.

This Court has previously recognized that "[l]abeling an inmate a snitch [or a rat] may give rise to an Eighth Amendment violation if the prison official acted with deliberate indifference to a substantial risk of serious harm to the inmate." *Tabb v. Hannah*, No. 1:10-cv-1122, 2012 WL 3113856, at *6 (M.D. Pa. July 30, 2012); *see also Moore v. Mann*, 823 F. App'x 92, 96 (3d Cir. 2020) (recognizing that "other circuit shave held that prison officials' failure to protect an inmate labeled a 'snitch' constitutes deliberate indifference").   In support of summary judgment, Defendants maintain that "Marhelko and Tomcavage were not in the facility and Gregoire was inside the control center for the block and only witnessed the [February 12, 2016] attach on the video cameras." (Doc. No. 338 at 29.)   They assert that they had "no prior knowledge of a risk to Plaintiff." (*Id.*)   They further argue that "there is no

evidence that [the inmate who attacked Plaintiff on May 16, 2016] was the same inmate who had threatened Plaintiff [on May 11, 2016]." (*Id.* at 30.)

Upon review of the record, the Court concludes that there exists a genuine issue of material fact as to whether Defendants Marhelko, Tomcavage, and Albert created a risk of serious harm to Plaintiff. With respect to the February 12, 2016 incident, Plaintiff avers in his declaration that Defendants Tomcavage and Marhelko "promulgated Plaintiff was a rat to all inmates on the BMU." (Doc. No. 394-2 ¶ 45.) He further avers that Defendants Marhelko and Tomcavage paid inmate Irby "incentive points to throw urine on Plaintiff." (*Id.* ¶¶ 43-44.) With respect to the May 16, 2016 incident, Plaintiff maintains that on May 11, 2016, Defendants Tomcavage and Albert were standing at his cell door when an inmate stated, "F*** this rat a** pu*** y'all always baby him. I'ma beat his a** first chance I get." (*Id.* ¶ 46.) Plaintiff asserts he was then assaulted by this same inmate on May 16, 2016. (*Id.* ¶ 47.) Defendants' evidence, however, suggests that Defendant Albert never heard Plaintiff be threatened by any inmates in the BMU. (Defs. Ex. A.) Moreover, Defendants Tomcavage and Marhelko deny ever labeling Plaintiff as a rat. (Defs. Exs. G, I.) Defendants Tomcavage and Marhelko also indicated that they did not tell inmate Irby to assault Plaintiff. (Defs. Ex. CW.) These issues of fact turn on a credibility assessment, a task in which the Court may not partake at the summary

judgment stage. *See Anderson*, 477 U.S. at 252. Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendants Albert, Tomcavage, and Marhelko chose to disregard an excessive risk to Plaintiff's safety. *See Moore*, 823 F. App'x at 96-97 (vacating summary judgment because the inmate-plaintiff presented circumstantial evidence that the defendants had discussed his criminal history with other inmates, who both threatened to assault and did assault him). Accordingly, the Court will deny summary judgment as to Plaintiff's failure to protect claim against them.[4]

### 4. Excessive Force

The Eighth Amendment's protection against cruel and unusual punishment is the "primary source of substantive protection in cases where an inmate challenges a prison official's use of force as excessive and unjustified." *See Brooks v. Kyler*, 204 F.3d 102, 105 (3d Cir. 2000). The standard governing the Court's inquiry as to whether a plaintiff has a viable excessive force claim is "whether force was applied

---

[4] It is unclear whether Plaintiff has asserted his failure to protect claim against Defendant Gregoire. However, the undisputed evidence indicates that Defendant Gregoire was inside the BMU control room and witnessed the February 12, 2016 incident via camera. (Defs. Ex. CW.) He immediately entered the treatment room and escorted the inmates to their cells. (*Id.*) Moreover, nothing in the record before the Court indicates that Defendant Gregoire was aware of any risk of harm to Plaintiff's safety prior to this incident. Accordingly, Defendant Gregoire is entitled to summary judgment with respect to Plaintiff's failure to protect claim.

in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *See Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

Under proper circumstances, a court may determine the issue of whether excessive force was used as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." *See Brooks*, 204 F.3d at 106 (quoting *Whitley*, 475 U.S. at 322). In making this determination, courts are tasked with evaluating the following *Whitley* factors:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* The United States Supreme Court has stated:

> [W]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1 (1992)).

41

When a court considers such claims, the reasonableness of a particular use of force often depends upon the relevant factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *See Graham v. Connor*, 490 U.S. 386, 396-97 (1989); *see also Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000) ("[E]ven if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused . . . any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'"). Additionally, *de minimis* use of physical force does not qualify as excessive force unless the force is "repugnant to the conscience of mankind." *See Brooks*, 204 F.3d at 107 (citing *Hudson*, 503 U.S. at 6); *see also Wilkins*, 559 U.S. 34 (2010) (clarifying that *de minimis* force, rather than *de minimis* injury, is the dispositive issue). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *See Hudson*, 503 U.S. at 9.

### a.   Forced Haircut

Plaintiff claims that on May 20, 2015, he was extracted from his cell and placed in a restraint chair to have his hair forcefully cut. (Doc. No. 1 ¶ 55.) Plaintiff was "told he put in a hair exemption in 2014 which was denied per Defendant Miller and Defendant Tritt." (*Id.* ¶ 57.) After he was strapped in the chair, he was "grabbed

42

by the jawline" and was tasered five (5) times during the haircut.  (*Id.* ¶¶ 59-60.)

According to Plaintiff, his hair was "not longer than the collar which was policy at

the time."  (*Id.* ¶ 61.)  He also maintains that Defendants Tritt and Miller falsified

documents to indicate that "Plaintiff was denied a hair exemption in 2014 which

prevented him from pursuing one on" May 20, 2015.  (*Id.* ¶ 62.)  Defendants assert

that Plaintiff's hair was cut "as a good faith effort to restore and maintain order"

because Plaintiff had "hidden shards of broken glass in his hair, which he had used

to cut through restraints."  (Doc. No. 338 at 31-32.)

The parties have presented two different views of events concerning the need

for the use of force to cut Plaintiff's hair on May 20, 2015.  In his deposition and

declaration, Plaintiff maintains that he never received a misconduct for hiding

contraband, including glass, in his hair, and that he never hid shards of glass in his

hair.  (Defs. Ex. W; Doc. No. 394-2 ¶¶ 28-30.)  Defendants aver that Plaintiff had

hidden the glass in his hair and used it to cut through the restraints.  (Defs. Exs. AL,

AR.)  Moreover, Plaintiff testified during his deposition that even though he was

fully immobile in the restraint chair, he was tasered five times in the chest during the

haircut.  (Defs. Ex. W)  He asserted that the tasering caused him to defecate on

himself, and that he lost mobility and range of motion in his shoulders.  (*Id.*)  He

also averred that the ankle straps were extremely tight, causing damage to his

43

Achilles tendon that he "complained about numerous times during that traumatic experience." (*Id.*)  Whether there was a need for such force to cut Plaintiff's hair is a factual issue, and given the discrepancies between the parties' view of events, the Court cannot find that there is no genuine dispute of material fact to warrant summary judgment in favor of Defendants.  In the instant case, "a reasonable jury could conclude that [Defendants'] actions were not based upon a good faith effort to maintain or restore discipline." *See Stevenson*, 2018 WL 797425, at *4.  The Court, therefore, will deny Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claim concerning the forced haircut.

### b.    Use of OC Spray

Plaintiff also takes issue with Defendant Albert's use of OC spray on two (2) occasions, April 8, 2015 and August 5, 2015.  (Doc. No. 11 ¶¶ 27, 29, 30-32, 109-13.)  Defendants assert that the OC spray was used on Plaintiff "in response to his refusal to obey orders; thus, the spray was used in order to obtain his compliance and restore order to the prison."  (Doc. No. 338 at 32.)  "The use of chemical agents to subdue recalcitrant prisoners is not cruel and unusual when reasonably necessary." *Gibson v. Flemming*, --- F. App'x ----, 2020 WL 7775501, at *1 (3d Cir. Dec. 30, 2020) (citing *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)).

44

With respect to the incident that occurred on April 8, 2015, Plaintiff maintains that he never refused to come out of his cell and that Defendant Albert sprayed him anyway. (Doc. No. 394-2 ¶ 9.) Defendants, however, have submitted video evidence of the incident. The video footage indicates that Defendant Albert directed Plaintiff several times to come to the door to submit to handcuffs and that Plaintiff refused to submit. The OC spray was then used to gain Plaintiff's compliance. Although Plaintiff's version of events contradicts Defendants' account, the Court concludes that no reasonable factfinder could find that Defendant Albert used excessive force against Plaintiff because videotape evidence of the incident "blatantly contradicts" Plaintiff's version of events. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that videotape evidence "utterly discredited" the non-moving party's version of events and warranted summary judgment for the movant). Moreover, nothing in the record suggests that Plaintiff suffered any injuries "beyond the temporary discomfort of the OC spray." *Gibson*, 2020 WL 7775501, at *2. The Court, therefore, will grant Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claim concerning the use of OC spray on April 8, 2015.

With respect to the incident that occurred on August 5, 2015, Plaintiff maintains that Defendant Albert approached his cell, stated "I told you I would get

you," and sprayed Plaintiff in the face numerous times with OC spray.  (Doc. No. 394-2 ¶ 52.)  Plaintiff indicates that at no time prior to this incident was he attempting to destroy the intermediate restraint belt.  (*Id.* ¶ 53.)  Plaintiff also avers that Defendant Albert left him in the cell for fifty (50) minutes after spraying him with OC spray.  (*Id.* ¶ 54.)  Defendants, however, aver that OC spray was used because Plaintiff refused orders to stop trying to cut himself out of the intermediate restraint belt.  (Defs. Ex. BO.)  Whether there was a need for the use of OC spray on August 5, 2015 is a factual issue, and given the discrepancies between the parties' view of events, the Court cannot find that there is no genuine dispute of material fact to warrant summary judgment in favor of Defendants.  In the instant case, a reasonable jury could conclude that Plaintiff was not being recalcitrant and, therefore, that the use of OC spray was not reasonably necessary.  *See Gibson*, 2020 WL 7775501, at *1.  The Court, therefore, will deny Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment claim concerning the use of OC spray on August 5, 2015.

### c.    Use of Restraint Chair and Intermediate Restraint Belt

Throughout his amended complaint, Plaintiff avers that his Eighth Amendment rights were violated when Defendants placed him in a restraint chair or intermediate restraint belt on numerous occasions.  Defendants assert that they are

entitled to summary judgment because these restraints were used "as a good faith effort to restore and maintain safety and order."  (Doc. No. 338 at 33.)

The Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730 (2002) is the controlling case on the "constitutionality of mechanical restraints." *See Zimmerman v. Schaeffer*, 654 F. Supp. 2d 226, 249 (M.D. Pa. 2009).  In *Hope*, the Supreme Court

> identified particular criteria relevant to the use of excessive force test, holding that (1) where the inmate had 'already been subdued, handcuffed, [and] placed in leg irons,' and (2) there was a 'clear lack of an emergency situation,' such that '[a]ny safety concerns had long since abated,' then (3) subjecting the inmate to 'substantial risk of physical harm' and 'unnecessary pain' serves no penological justification.

*Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (quoting *Hope*, 536 U.S. at 738).

Upon consideration of the record, the Court concludes that there is a dispute of fact as to whether Defendants exposed Plaintiff to a "substantial risk of physical harm" and "unnecessary pain" by placing him in the restraint char and intermediate restraint belt for extended periods of time.  Plaintiff has submitted a copy of the DOC's policy regarding the use of force, DC-ADM 201, which was in place during the incidents in question.  That policy specifically provides that "[u]se of the restraint chair may not exceed eight hours without approval of the Facility Manager/designee."  (Doc. No. 395-2 at 21.)  The maximum period of time an inmate can be maintained in the intermediate restraint belt is twenty-four (24) hours.

47

(*Id.* at 25.)  Defendants' undisputed statement of facts, however, provides that on several occasions, Plaintiff was kept in the restraint chair for over eight (8) hours and that use of the chair, even if for eight (8) hours, was immediately followed by use of the intermediate restraint belt.  Moreover, the undisputed facts indicate that on at least two (2) occasions, Plaintiff was placed in the intermediate restraint belt for over twenty-four (24) hours.  Defendants have not cited any evidence, and the Court has not located any, suggesting that the use of the restraints for longer periods of time than set forth in DC-ADM 201 was authorized and necessary.  Moreover, in his declaration, Plaintiff avers that even though he was often complaint and not resisting, the use of restraints was extended.

In *Young*, the Third Circuit concluded that summary judgment was not warranted where an inmate had been placed in a restraint chair for nearly fourteen (14) hours.  *See Young*, 801 F.3d at 182.  On the record before the Court, Plaintiff is "entitled to have a jury determine whether he was subjected to 'a substantial risk of physical harm' without penological justification and whether the Defendants thus 'violated the basic concept underlying the Eighth Amendment.'"  *Id.* (quoting *Hope*, 536 U.S. at 738.  Given the record, a reasonable jury could conclude that Defendants used excessive force against Plaintiff by consistently punishing him by placing him in the restraint chair and the intermediate restraint belt.  The Court, therefore, will

48

deny summary judgment with respect to Plaintiff's Eighth Amendment excessive force claims concerning use of the restraint chair and the intermediate restraint belt.

### d. Use of Smock Blanket

Plaintiff next claims that on August 17, 2015, during his placement in the restraint chair, Defendant Tritt directed staff members to place a smock blanket around his body and clasp it at his neck with flex cuffs.  (Doc. No. 11 ¶ 134.) Plaintiff asserts that he was choked and started to sweat all over.  (*Id.* ¶ 135.)  He also began to hyperventilate.  (*Id.*)  Plaintiff avers that the smock blanket was clasped around his neck for eight (8) hours, and that the use of the smock blanket in this matter was not normal.  (*Id.* ¶¶ 136-37.)  Defendants argue that the smock blanket "was used to restrain Plaintiff in the chair after he had maneuvered a suicide vest out of the way to be able to chew through the shoulder straps on a chair multiple times during exercise periods."  (Doc. No. 338 at 33-34.)  They maintain that staff "confirmed that the blanket was not tied tightly around his neck."  (*Id.* at 34.)

In his deposition and declaration, Plaintiff maintains that the smock blanket was cuffed around his neck for eight (8) hours and that he experienced choking and hyperventilating.  (Defs. Ex. W; Doc. No. 394-2 ¶ 26.)  Defendants maintain that staff discerned that the blanket was not tied tightly around Plaintiff's neck.  (Doc. No. 338 at 34.)  The exhibits Defendants reference, however, do not make any

mention of the use of the smock blanket around Plaintiff's neck. Moreover, Defendants have not submitted any photographs or video footage of the use of the smock blanket around Plaintiff's neck. Given the state of the record, the Court concludes that there is a genuine issue of material fact concerning whether the smock blanket was cuffed around Plaintiff's neck to maliciously cause harm or as a good faith effort to restore order. The Court, therefore, will deny Defendants' motion for summary judgment with respect to this claim.

### e.   Use of Force by Defendant Corby

Plaintiff avers that on April 8, 2015, while in the restraint chair, Defendant Corby "struck him in the face out of camera view." (Doc. No. 11 ¶ 35.) Plaintiff avers as such in his declaration and maintains that he was not resisting or trying to escape from the restraint chair when this occurred. (Doc. No. 394-2 ¶ 11.) Defendants' exhibits in support of their motion suggest that Defendant Corby did not strike Plaintiff in the face. (Defs. Ex. AL.) Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Corby maliciously used force against Plaintiff on April 8, 2015. These issues of fact turn on a credibility assessment, a task in which the Court may not partake at the summary judgment stage. *See Anderson*, 477 U.S. at 252. The Court, therefore, will deny summary

judgment as to Plaintiff's claim against Defendant Corby for the use of excessive force on April 8, 2015.

Plaintiff also maintains that excessive force was used against him during a planned cell extraction on April 9, 2015. (Doc. No. 11 ¶¶ 39-41.) He claims that during the cell extraction, he was abused and assaulted as his head was "banged . . . off the ground repeatedly." (*Id.* ¶ 40.) Plaintiff alleges that the left side of his face was injured and that "blood was gushing out." (*Id.* ¶ 41.) In both his deposition and his declaration, Plaintiff avers that Defendant Corby is the individual who slammed his head against the ground repeatedly. (Defs. Ex. W; Doc. No. 394-2 ¶¶ 18-20.) Defendants' exhibits suggest that Plaintiff bit Defendant Corby during this incident (Defs. Exs. B, AL); Plaintiff, however, asserts that he never tried to bite him (Doc. No. 394-2 ¶ 19). Moreover, the video footage of the event is unclear given the number of staff members involved in the cell extraction. As such, there is no objective evidence that clearly demonstrates that Defendant Corby did not repeatedly slam Plaintiff's head into the ground. *See Stevenson v. Cty. Sheriff's Office of Monmouth*, No. 15-5953, 2018 WL 797425, at *4 (D.N.J. Feb. 8, 2018).

Given the discrepancies in the parties' view of the events, and viewing the facts in the light most favorable to Plaintiff, a reasonable juror could conclude that Defendant Corby maliciously used force against Plaintiff on April 9, 2015. These

issues of fact turn on a credibility assessment, a task in which the Court may not partake at the summary judgment stage. *See Anderson*, 477 U.S. at 252. The Court, therefore, will deny summary judgment as to Plaintiff's claim against Defendant Corby for the use of excessive force on April 9, 2015.

### f.      Use of Force by Defendant Kostinko

Next, Plaintiff alleges that on December 22, 2015, he was being escorted back to his cell when Defendant Kostinko stated "I'm sick of your s***." (Doc. No. 11 ¶ 162.) Plaintiff avers that Defendant Kostinko then threw Plaintiff into the wall "with brute force as Plaintiff was handcuffed behind his back not resisting." (*Id.*) Defendant Kostinko then threw Plaintiff to the ground and had his elbow in Plaintiff's neck. (*Id.* ¶ 163.) According to Plaintiff, Defendant Kostinkso said his actions were for everything Plaintiff had "put us through." (*Id.* ¶ 164.)

Defendants assert that they are entitled to summary judgment because "[g]iven Plaintiff's assaultive history, Kostinko chose to use additional force to secure Plaintiff and maintain control of the escort." (Doc. No. 338 at 34.) As part of the record, Defendants have submitted reports and video footage that covered the use of force. (Defs. Ex. CT.) The reports indicate that during the escort, Defendant Kostinko thought Plaintiff had tensed up and he thought that Plaintiff was going to try to get away. (*Id.*) Defendant Kostinko also thought that he had been elbowed in

the side by Plaintiff, but later admitted that he could have been elbowed by a fellow correctional officer.  (*Id.*)  Plaintiff avers that at no time did he resist or was combative during the escort.  (Doc. No. 394-2 ¶ 49.)  Moreover, in the video footage of the BMU hallway where the use of force occurred, the Court is unable to clearly discern whether Plaintiff tensed up and whether Defendant Kostinko was even elbowed in the side.  As such, there is no objective evidence that clearly supports Defendants' version of events.  *See Stevenson*, 2018 WL 797425, at *4.

There is no dispute that Defendant Kostinko used force against Plaintiff on December 22, 2015.  However, whether there was even a need for such force is a factual issue, and given the discrepancies between the parties' view of events, the Court cannot find that there is no genuine dispute of material fact to warrant summary judgment in favor of Defendants.  In the instant case, "a reasonable jury could conclude that [Defendant Kostinko's] actions were not based upon a good faith effort to maintain or restore discipline."  *Id.*  The Court, therefore, will deny summary judgment with respect to Plaintiff's Eighth Amendment excessive force claim against Defendant Kostinko concerning the events of December 22, 2015.

### C.    First Amendment Claims

### 1.    Access to the Courts

Plaintiff avers that on September 10, 2015, his property was thrown away, leading to the loss of over 300 pages of legal work, "including grievances and a filed 1983 for SCI Greene County." (Doc. No. 11 ¶ 224.) Plaintiff maintains that he never recovered his legal work, preventing him from pursuing his § 1983 suit because the statute of limitations has expired. (*Id.* ¶ 225.) Plaintiff avers that this action violated his right to access the courts. (*Id.* ¶ 226.)

It is well settled that "prisoners have a constitutional right of access to the courts." *See Bounds v. Smith*, 430 U.S. 817, 821 (1977). To maintain such a claim, Plaintiff must demonstrate that "his efforts to pursue a legal claim were hindered and he suffered an actual injury." *Ross v. Clerk of Courts of Court of Common Pleas of Phila.*, 726 F. App'x 864, 865 (3d Cir. 2018) (citing *Lewis v. Casey*, 518 U.S. 343, 351 (1996)). "[P]risoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). An inmate raising an access to the courts claim "must describe the underlying claim well enough to show that it is 'more than mere hope,' and [he] must describe the 'lost remedy.'" *Christopher v. Harbury*, 536 U.S. 403, 416-18 (2002).

The Court agrees with Defendants that Plaintiff has failed to present evidence demonstrating that their conduct denied him access to the courts.  In his declaration, Plaintiff vaguely states that he had "exhausted his remedies on issues at SCI Greene which consist of a faulty light and Plaintiff['s] wound getting infected after denial of treatment."  (Doc. No. 394-2 ¶ 56.)  He mentions that the issues raised in his prepared complaint concerned events at SCI Greene that occurred in 2012 and 2013. (*Id.* ¶ 58.)  To the extent Plaintiff sought to pursue conditions of confinement claims concerning his incarceration at SCI Greene, he has not provided sufficient evidence about the merits of the claims that he wished to pursue in his lawsuit.  *See Presbury v. Wetzel*, 789 F. App'x 294, 295 (3d Cir. 2020) (concluding same).  While Plaintiff asserts that he was denied the grievance procedure as part of the step-down program (Doc. No. 394 at 16-17), he fails to provide evidence of what claims he would have raised if he could have filed grievances during this time.  Moreover, Plaintiff fails to demonstrate that his inability to use the grievance system hindered his ability to pursue either a challenge to his sentence or a challenge to his conditions of confinement.  *See Heath v. Link*, 787 F. App'x 133, 136 (3d Cir. 2019) (concluding same regarding legal materials).  The Court, therefore, will grant Defendants

summary judgment with respect to Plaintiff's First Amendment access to the courts claim.[5]

## 2.    Retaliation

In his amended complaint, Plaintiff suggests that Defendants retaliated against him for filing grievances and complaints by subjecting him to the conditions and actions set forth *supra*.  To state a retaliation claim under the First Amendment, a plaintiff bears the burden of satisfying three (3) elements.  First, a plaintiff must prove that he was engaged in a constitutionally protected activity.  *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).  Second, a plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials."  *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)).  This requirement is satisfied by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights."  *Id.* (quoting *Suppon v. Dadonna*, 2013 F.3d 228, 235 (3d Cir. 2000)).  Third, a prisoner must prove that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to

---

[5] In any event, prisoners do not have a constitutional right to a grievance procedure. *See Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009).  Accordingly, Plaintiff cannot maintain a claim regarding his inability to access the grievance procedure during step-down. *Cf. Rosado v. Virgil*, No. 09-156, 2011 WL 4527067, at *9 (W.D. Pa. Sept. 28, 2011) (noting that because prisoners do not have a constitutional right to a grievance procedure, "[i]t follows, therefore, that placing a prisoner on grievance restriction does not deprive him of a due process right because no protected liberty interest is implicated").

discipline him." *Rauser*, 241 F.3d at 333-34 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The mere fact that an adverse action occurs after either a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005). Only when the facts of a particular case are "unusually suggestive" of a retaliatory motive will temporal proximity, on its own, support an inference of causation. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). The Third Circuit has noted that an inmate can satisfy this burden "with evidence of either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2002).

If a prisoner establishes a *prima facie* case of retaliation, the burden shifts to prison officials to show, by a preponderance of the evidence, that "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334. "This is often referred to as the 'same decision defense.'" *Watson*, 834 F.3d at 422. If the prison officials

can make this showing, it defeats the retaliation claim. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

The filing of grievances constitutes protected activity. *See Mearin v. Vidonish*, 450 F. App'x 100, 102 (3d Cir. 2011). Defendants do not dispute this factor. (Doc. No. 338 at 21.) Moreover, Defendants do not dispute that Plaintiff was subject to adverse action. Rather, Defendants argue that Plaintiff "cannot show that his grievance[s] [were] a substantial motivating factor for the alleged actions by Defendants." (*Id.*) Defendants assert that "there is no evidence that [Defendants] Corby, Gregoire, or Kostinko were aware of Plaintiff's grievances." (*Id.* at 21-22.) The Court agrees with Defendants' argument. Nothing in the evidence before the Court would permit a finding that Defendants, Corby, Gregoire, or Kostinko were aware of any written grievances submitted by Plaintiff. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196-97 (3d Cir. 2015) (noting that aa plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted"); *Whitehead v. Rozum*, No. 09-220J, 2012 WL 4078422, at *6 (W.D. Pa. Aug. 14, 2012) (concluding that the inmate-plaintiff had failed to demonstrate that corrections officers were "aware of his filing of . . . grievances such as to establish any motivating factor"), *Report and Recommendation adopted*, 2012

58

WL 4086717 (W.D. Pa. Sept. 17, 2012). Defendants' motion will, therefore, be granted as to Plaintiff's retaliation claim against Defendants Corby, Gregoire, and Kostinko.

Plaintiff testified that grievances submitted by inmates in the BMU must be recorded by the unit manager, either Defendant Dowd or Defendant Tomcavage, so that they can be sent to the Central Office. (Defs. Ex. W.) Moreover, Defendants Tomcavage, Albert, Marhelko, Keller, Miler, and Tritt all delivered grievance responses to inmates. (*Id.*) Defendants assert, however, that "there is no evidence that Plaintiff's *grievances* were a substantial motivating factor in their actions taken with respect to him." (Doc. No. 338 at 22.) They argue that, at most, "their words and actions demonstrated a general displeasure with needing to deal with Plaintiff, but nothing indicates that prison grievances alleging them to be wrongdoers bothered them in any way or that such grievances were anything out of the ordinary for them as officials working in a prison setting." (*Id.*)

With respect to the third prong of a retaliation claim, while causation may be established by direct or circumstantial evidence, "motivation is almost never subject to proof by direct evidence." *See Watson*, 834 F.3d at 422. Thus, motivation is typically demonstrated by "evidence of either (1) an unusually suggestive temporary proximity between the protected activity and the allegedly retaliatory action, or (2)

59

a pattern of antagonism coupled with timing that suggests a causal link." *See id.* As discussed *supra*, there exist genuine issues of material fact precluding the Court from granting summary judgment on several of Plaintiff's Eighth Amendment claims. Given that those facts are intertwined with Plaintiff's retaliation claim, the Court concludes that there exist genuine issues of material fact with respect to whether Plaintiff's protected activity was a motivating factor in the actions taken by Defendants Dowd, Tomcavage, Albert, Marhelko, Keller, Miler, and Tritt. *See Sanders v. Rose*, No. 1:10-cv-1241, 2021 WL 103662, at *14 (M.D. Pa. Jan. 12, 2021) (concluding same). The Court, therefore, will deny summary judgment as to Plaintiff's retaliation claim against these Defendants.

### D. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a right was clearly established, the Court must ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Schmidt v. Creedon*, 639 F.3d 587, 598 (3d Cir. 2011). "If it would not have been clear to a

60

reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." *Id.* Stated differently, for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *See al-Kidd*, 563 U.S. at 741. As the Supreme Court recently noted, "[t]his demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Accordingly, "there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *See Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)).

The United States Supreme Court's decision in *White v. Pauly*, 137 S. Ct. 548 (2017), clarifies the Court's inquiry in this regard. In that case, the Supreme Court reaffirmed that its case law "do[es] not require a case directly on point" for a right to be clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate."[6] *See id.* at 551 (internal quotation marks

---

[6] There may be the rare "obvious case," however, where "a body of case law" is not necessary. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).

omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)).  The Supreme Court reiterated that the clearly-established law "must be 'particularized' to the facts of the case," and cautioned that the fact that a case presents a unique set of facts and circumstances is an "important indication" that a defendant's conduct at issue did not violate a "clearly established" right.  *See id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Defendants assert that they are entitled to qualified immunity because "even if the Court would conclude a violation, they were not clearly established in law at the time of the alleged violations."  (Doc. No. 338 at 36.)  They maintain that "Defendants could not have recognized that their actions would constitute a *per se* violation of some clearly established right of the Plaintiff given that the case law . . . clearly indicates the opposite."  (*Id.*)  They argue further that they "could not have recognized that using some minimal force against Plaintiff to maintain or restore order would violate clearly established law at the time."  (*Id.*)  As discussed *supra*, however, there are genuine issues of material fact concerning whether force was maliciously used against Plaintiff to cause harm or to maintain or restore order. The Court, therefore, cannot conclude that Defendants are entitled to qualified immunity at this time.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Doc. No. 306) will be granted in part and denied in part.  The motion will be granted as to: (1) Plaintiff's Eighth Amendment claim concerning the security lighting; (2) Plaintiff's Eighth Amendment claim that female nurses observed him naked; (3) Plaintiff's Eighth Amendment claim concerning conditions in the cells; (4) Plaintiff's Eighth Amendment claim concerning medical care; (5) Plaintiff's Eighth Amendment claim concerning the use of OC spray on April 5, 2015; (6) Plaintiff's First Amendment access to the courts claim; and (7) Plaintiff's First Amendment retaliation claim against Defendants Corby, Gregoire, and Kostinko.  The motion will be denied with respect to Plaintiff's remaining claims.  An appropriate Order follows.

s/ Sylvia H. Rambo
United States District Judge

Date: March 16, 2021